UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

ROBERT E. COYLE,                    :
                    Plaintiff,

                                    :  **REPORT AND RECOMMENDATION**
          -against-                 :

                                    :     01 Civ. 11801
JO ANNE B. BARNHART,                    (DAB)(MHD)
Commissioner of Social Security     :
                    Defendant.

-----------------------------------X

**TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:**


Robert E. Coyle brings this action pursuant to 42 U.S.C. §
405(g)[1] to challenge the final decision of the Commissioner of the
Social Security Administration (the "Commissioner" and the "SSA,"
respectively) that Coyle was not entitled to Social Security
disability benefits. Plaintiff moves for judgment on the pleadings
pursuant to *Rule 12(c) of the Federal Rules of Civil Procedure*. He
seeks an order reversing the Commissioner's determination that he
is not disabled or in the alternative, a remand of the case for a
new hearing and decision. The Commissioner cross-moves for judgment
on the pleadings. For the reasons set forth below, we recommend
that plaintiff's motion be denied and the Commissioner's motion for
judgment on the pleadings be granted.

---

[1] This provision of the SSA provides that "the court shall
have power to enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the
decision of the Commissioner of Social Security , with or without
remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Coyle filed an application for Social Security disability benefits on June 3, 1997, alleging that he became disabled on January 17, 1996, due to coronary artery disease, diabetes mellitus, a herniated disc, and arthritis. (Tr. 97-100, 115).[2] The SSA denied his application on October 28, 1997, and again on reconsideration on January 30, 1998. (Tr. 81-88). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 89-92). The ALJ considered the matter de novo at a hearing held on November 10, 1998. (Id.). Plaintiff appeared, represented by counsel, and testified. (Tr. 34). On December 22, 1998, the ALJ, James D. Reap, found that the plaintiff was not disabled. (Tr. 14-27). Plaintiff appealed the decision but the SSA Office of Hearings and Appeals denied his request for a review. (Tr. 2). Thus, the ALJ's decision became final on November 15, 2001. (Tr. 2-3).

Plaintiff subsequently appealed his case to the United States District Court for the Southern District of New York. Thereafter, on July 3, 2002, the parties stipulated to remand the case to the Commissioner for further administrative proceedings. The Honorable Deborah A. Batts, United States District Court Judge, ordered this

---

[2] "Tr." refers to administrative record filed by the Commissioner as part of the answer. (Docket no. 9).

stipulation on July 16, 2002. (Tr. 345-46).

A new hearing was held on December 12, 2002, before the same ALJ. (Tr. 311-41). Plaintiff, represented by counsel, re-testified at this hearing. (Id.). Also testifying at this hearing was a vocational expert. (Id.). On December 26, 2002, the ALJ issued a decision finding the plaintiff was not "disabled" as defined under the Social Security Act at any time through December 31, 1997, the expiration of the date last insured for disability benefits. (Tr. 300-09). The ALJ also found that the plaintiff's medical conditions did not prevent him from performing his past relevant work. (Tr. 308). The Appeals Council again concluded that the decision of the ALJ was well supported by the evidence. (Tr. 284-85).

Plaintiff then commenced this action alleging that he did not receive a full and fair hearing, the Commissioner's findings were contrary to Social Security Law, and the ALJ's findings were not supported by substantial evidence. Thereafter, the plaintiff moved for judgment on the pleadings pursuant to *Rule 12(c) of the Federal Rules of Civil Procedure*, seeking an order reversing the Commissioner's determination or an order remanding the case for a new hearing and decision. The Commissioner then cross-moved for judgment on the pleadings.

**FACTUAL BACKGROUND**

I. <u>Non-Medical Evidence</u>


Plaintiff was born on November 23, 1929, and was fifty-eight years old at the time of the ALJ's first decision on December 22, 1998. (Tr. 94). He completed thirteen years of schooling plus numerous banking courses. (Tr. 39, 94). Plaintiff also testified that he lives with his wife. (Tr. 52, 301).


Plaintiff worked for Manhattan Savings Bank for twenty-eight years until 1990, the last nineteen years of which were spent as the bank manager. (Tr. 94). According to plaintiff's testimony and his disability report, this job involved no lifting or carrying. (Tr. 141). Each business day, he stood for three hours, walked for three hours, and sat for approximately two hours. (<u>Id.</u>). His job responsibilities also included supervising several people, making sure the teller windows were adequately staffed, and organizing staff breaks. (Tr. 142). In 1992, plaintiff also worked part-time for one tax season at H&R Block. (<u>Id.</u>). Plaintiff has not worked since April 1992. (<u>Id.</u>).


At his first ALJ hearing, plaintiff testified that he drove a car daily for short distances, walked three miles a day, and did at least ten minutes of daily stretching exercises. (Tr. 44, 51, 54).

He also did chores around the house such as washing dishes, emptying the garbage, and limited yard work. (Tr. 51-52). Plaintiff also testified that he played golf about 20 times a year. (Tr. 52). During these golf games, he walked the three and a half mile course and carried his clubs without assistance. (Tr. 53, 316). At his December 2002 hearing, plaintiff testified that he continued to play golf but now used a cart. (Tr. 316). He also stated that it now took him over four hours to complete a round. (Id.).

II. <u>Medical Evidence</u>

A. <u>Treating Physicians</u>

In January 1993, plaintiff suffered his first myocardial infarction ("MI") and a second, more severe, attack on January 17, 1996. (Tr. 148-89). After his second MI, Dr. Landzberg performed a cardiac catheterization which revealed a severe lesion of the plaintiff's right artery. (Tr. 181, 189). Dr. Landzberg, plaintiff's cardiologist, recommended that the plaintiff undergo a coronary angioplasty. (Tr. 181). On January, 19, 1997, Dr. Lichtstein performed a successful balloon angioplasty on the plaintiff's right coronary artery. (Tr. 177). The following day, the plaintiff was discharged and told to follow up with his primary care physician in two weeks. (Tr. 187).

Dr. Landzberg examined plaintiff on February 8, 1996, and found that he was doing well, was active, and experiencing no chest pain. (Tr. 190). Dr. Landzberg examined plaintiff again on May 9, 1996, and reported that he continued to have no chest pain. (Tr. 191). Dr. Landzberg's notes also reflect that plaintiff was walking daily and playing golf twice a week. (Id.). Dr. Landzberg's notes from plaintiff's May 23, 1997 examination report similar results. (Tr. 192). He reported that plaintiff was walking forty-five minutes a day and had no chest pain. (Id.). He also reported that plaintiff's diabetes were under control. (Id.).

Plaintiff underwent a CAT scan on his lumbar spine on May 21, 1997. (Tr. 279). The scan revealed a right disc herniation at L5-S1. (Id.). The CAT scan also revealed that plaintiff had non-compressive degenerative changes at L3-4 and L4-5. (Id.).

Dr. Gupta, a neurologist, evaluated plaintiff for the pain in his lower back, right hip, and lower right extremity on June 6, 1997. (Tr. 275). At this examination, plaintiff reported that he experienced leg pain radiating down the back of his right thigh to the mid-calf area when he drove a car. (Id.). In the absence of driving, the pain was confined to the back and buttocks area. (Id.). Upon examination, Dr. Gupta found no weakness in any of the plaintiff's extremities but did conclude that straight leg raising

6

was positive on the right at 70 degrees.[3] (Tr. 276). According to Dr. Gupta, the plaintiff's symptoms suggested a right lumbosacral radiculopathy. (Id.). To treat plaintiff's condition, Dr. Gupta performed two epidural steroid injections on the plaintiff. (Tr. 48). On July 15, 1997, after receiving a second injection, plaintiff was hospitalized with a staphylococcus meningitis infection. (Tr. 253). As a result of this infection, the plaintiff is unwilling to undergo another of these injections. (Tr. 48).

Dr. Joseph Spinapolice became plaintiff's primary care physician in 1977. (Tr. 144). Dr. Spinapolice has completed several medical reports and assessments addressing plaintiff's ability to perform work related activities. (Id.). The first report, dated June 17, 1997, lists the treating diagnoses as insulin dependent diabetes, a herniated disc, an old myocardial infarction, and coronary insufficiency with angina and hypertension. (Id.). This report also listed plaintiff's symptoms as recurrent pain in his back, right hip and leg, paresthesia,[4] and occasional chest pain.

---

[3] Straight leg raising is a test used to evaluate the lumbosacral spine and the sciatic nerve. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees. 5 Attorneys' Textbook of Medicine § 15.34(1) (3d ed. 1999).

[4] Paresthesia refers to abnormal sensations such as numbness, prickling or tingling. Dorland's Illustrated Medical Dictionary 1232 (27th ed. 1988).

(Id.). This report also addressed plaintiff's residual functional capacity indicating that the plaintiff could lift and carry a maximum of five pounds and could sit for less than six hours a day. (Tr. 146-47). Dr. Spinapolice reported that the plaintiff could also stand or walk for up to two hours a day. (Tr. 147).

On a report dated January 13, 1998, Dr. Spinapolice noted that plaintiff's chest pain and diabetes were under control. (Tr. 253). He also reported that while the plaintiff's back pain and weakness persisted, they were improving. (Id.). In Dr. Spinapolice's opinion, plaintiff could lift and carry up to ten pounds, stand or walk for less than two hours a day, and sit for up to six hours a day. (Tr. 258).

Another report, dated October 25, 1998, indicated that plaintiff could sit for a total of two hours, stand for a total of two hours, and walk for a total of three hours. (Tr. 271). According to Dr. Spinapolice, plaintiff could lift up to ten pounds occasionally but had difficulty holding onto items because of peripheral neuropathy in his hands. (Tr. 272-73). This report also indicated that reaching, bending, or moving heavy equipment would exacerbate plaintiff's disc problem. (Tr. 274). Dr. Spinaplolice stated that plaintiff's angina, coronary artery disease, diabetes, and herniated disc limited the amount of time and amount of work

the plaintiff could attempt. (Id.). Dr. Spinapolice also noted that sedentary work caused the plaintiff leg and back pain and any strenuous activity was precluded by plaintiff's cardiac condition. (Id.).

In response to a request from the ALJ, Dr. Spinapolice completed a report that addressed plaintiff's residual functional capacity prior to December 31, 1997. (Tr. 385-89). This report was completed on October, 31, 2002. (Id.). According to this report, plaintiff could lift ten pounds occasionally and could stand or walk for at least two hours in an eight hour work day. (Tr. 386). Dr. Spinapolice reported that plaintiff had to periodically alternate between sitting and standing to alleviate pain or discomfort and had limited ability to push or pull with his lower extremities. (Tr. 387). This report also indicated that plaintiff's ability to perform gross and fine manipulations was unlimited. (Tr. 388).

In a letter, dated November 25, 2002, Dr. Spinapolice reported that plaintiff was unable to sit or stand for prolonged periods of time and that lifting, bending, and twisting exacerbated his pain. (Tr. 397). He also reported that plaintiff's diabetes had been progressive with visual deterioration and the advent of peripheral neuropathy in the upper and lower extremities. (Id.). Dr.

Spinapolice also noted that plaintiff's paresthesias in his hands and fingers prevented fine manipulations and affected his lower extremities. (Id.). Thus, Dr. Spinapolice concluded that the plaintiff was unable to perform any gainful employment. (Id.).

On May 7, 1999, plaintiff was seen by an ophthalmologist, Dr. Josef. (Tr. 390). Dr Josef reported that plaintiff's vision was 20/30 in his right eye and 20/25 in his left eye. (Id.). He also diagnosed plaintiff with diabetic retinopathy. (Id.).

B. Consulting Physicians

On July 2, 1997, a consulting physician, Dr. King, examined plaintiff. On examination, plaintiff demonstrated a normal range of motion of the wrists, elbows, shoulders, knees, ankles, hips, neck, and lumbar spine. (Tr. 214). Plaintiff's straight leg raising was also negative. (Id.). In Dr. King's opinion, there were no limitations on plaintiff's ability to speak, hear, sit, or perform any manipulative activities. (Id.). Dr. King, however, reported that plaintiff's cardiac condition and low back syndrome created moderate limitations in his ability to lift objects greater than ten pounds, carry heavy objects, and walk long distances. (Tr. 215).

Plaintiff underwent a treadmill stress test on September 17, 1997. (Tr. 220). He completed stage three of the test walking at 3.4 miles per hour on a fourteen percent incline. (Id.). During this test, plaintiff reported no chest pain. (Id.). However, the test was discontinued because of fatigue. (Id.). The results of the test indicated equivocal ischemia[5] at the peak work load with no chest discomfort. (Tr. 221). A medical consultant, Dr. Marasigan, reviewed the results of this stress test on October 23, 1997. (Tr. 245). Dr. Marasigan determined that plaintiff was capable of medium work. (Id.). In his opinion, plaintiff was able to lift twenty-five pounds frequently and fifty pounds occasionally. (Id.). He also opined that plaintiff could sit, stand, or walk for six hours a day for each. (Id.).

On January 27, 1998, Dr. Levit, a medical consultant, reviewed the medical evidence and assessed plaintiff's physical residual functional capacity. (Tr. 260-67). In his opinion, the plaintiff could lift twenty-five pounds frequently and fifty pounds occasionally. He also believed that plaintiff could sit and stand or walk for about six hours a day for each. (Tr. 261).

A medical advisor, Dr. Bernanke, further reviewed the medical

---

[5] Ischemia refers to a deficiency of blood in a part, due to functional constriction or actual obstruction of a blood vessel. Dorland's at 857.

evidence and attended and testified at both ALJ hearings. At the first hearing, he testified that plaintiff should not perform any heavy work but would probably be capable of sedentary work. (Tr. 66, 71). Dr. Bernanke defined sedentary work as being able to lift no more than ten pounds and sitting for several hours during the day but not necessarily continually. (Tr. 66). He also stated that sedentary work requires the ability to stand and walk. (Id.).

Dr. Bernanke testified that the plaintiff's stress test demonstrated his ability to perform moderately demanding activity. (Id.). He also stated that while plaintiff's diabetes could produce hypoglycemic episodes, plaintiff could manage these episodes by simply eating something. (Tr. 64, 69). Dr. Bernanke stated that findings with regard to plaintiff's retinopathy were not available. (Tr. 73). In response to plaintiff counsel's questioning, Dr. Bernanke testified that plaintiff would have difficulty working five days a week, eight hours a day. (Tr. 75-76). However, on reexamination, Dr. Bernanke clarified his answer and stated that "if [plaintiff's] motivation was very strong, he would do it." (Tr. 76). He also stated that performing a sedentary job would not cause plaintiff difficulties with his heart or his back. (Tr. 77).

At the second hearing, Dr. Bernanke reiterated that plaintiff's stress test results indicated that he could do a fair

amount of walking without having pain in his back. (Tr. 329). While Dr. Bernanke testified that plaintiff was precluded from doing any heavy lifting, he believed plaintiff could lift ten pounds regularly and perform sedentary work. (Tr. 330). Dr. Bernanke also commented that there was no mention of the effect of stress in plaintiff's record. (Tr. 331). He further testified that plaintiff only suffered from mild finger neuropathies and that his condition was not severe enough to qualify for Social Security disability or prevent him from working. (Tr. 335-336).

III. <u>Plaintiff's Medical Testimony</u>

Plaintiff testified at his first ALJ hearing held on November 10, 1998, that his heart condition had gotten better since the onset of his disability. (Tr. 50). However, despite this improvement, plaintiff testified that he still feared having another heart attack. (<u>Id.</u>). When asked why he could not work, the plaintiff stated that it was a combination of three factors- the fear of having another heart attack, his degenerating back and the daily problems associated with his diabetes. (Tr. 40).

Plaintiff also testified that he has trouble sitting still because of his sore back. (Tr. 56). He stated that he constantly shifts to try and find a more comfortable position and that this

shifting further aggravates his condition. (Tr. 56-57). Plaintiff stated that he could only sit for ten to twenty minutes without shifting. (Tr. 59). He also testified that the pain in his lower back often radiated down to the middle of his leg. (Tr. 57). Because of this pain, the plaintiff claims he has difficulty standing in one place and must shift his weight from one leg to the other trying to find a comfort zone. (Id.). Plaintiff also testified that he cannot bend and that he tires quickly. (Tr. 57-58).

At this same hearing, the plaintiff testified that he suffers from peripheral neuropathy in his fingers and right toe. (Tr. 41). Because of this condition, he claims that he cannot use a writing utensil in the same way he used to and can only sometimes pick up coins or button his shirt. (Tr. 42). Plaintiff, however, testified that his ability to dial and push buttons on a phone, pick up dollar bills, and grab cans off of a grocery shelf remain unaffected. (Id.). In response to the ALJ's questioning, the plaintiff clarified that while he had fine manipulation problems, he did not have any gross manipulation problems. (Tr. 43). Plaintiff further testified that because he believed his condition to be a result of his old age, he never brought this condition to his doctor's attention. (Tr. 41).

At his second ALJ hearing, plaintiff reiterated that he had trouble with fine dexterity. (Tr. 318). Because of this condition, plaintiff stated that he had trouble buttoning buttons and writing. (Id.). He further testified that he had numbness in his right toe and problems with his back. (Tr. 318-19). Plaintiff also explained that his back condition made sitting still difficult and prevented him from bending. (Tr. 319). Because of these ailments, plaintiff testified that there was no job he could perform five days a week for eight hours a day. (Tr. 322).

IV. <u>Vocational Evidence</u>

Amy Leopold appeared as a vocational expert at the second hearing held on December 12, 2002. (Tr. 336-341). She testified that the Dictionary of Occupational Titles ("DOT") number for a bank branch manager was 183.117-010. She further testified that a bank branch manager was a skilled, sedentary job that primarily involved sitting. (Tr. 338-39). Ms. Leopold opined that an individual, capable of performing sedentary work, of the same age, education, and work experience as the plaintiff would have the residual functional capacity to perform a bank manager position. (Id.). In response to plaintiff counsel's questioning, Ms. Leopold stated that if plaintiff was limited to sitting for a total of two hours a day, he would not be able to do his past job. (Tr. 340).

She also stated that fatigue and fine motor coordination limitations would impact plaintiff's ability to do his job. (Id.). Ms. Leopold further testified that plaintiff could perform his bank manager job even if he had difficulty bending. (Tr. 340).

## DISCUSSION

I. The Definition of Disability

To establish disability under the Social Security Act, a claimant must demonstrate "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The statute additionally requires that the claimant's impairment be

> of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A).

In making a determination as to a claimant's disability, the Commissioner is required to apply the five-step process set forth

in 20 C.F.R. § 404.1520. The Second Circuit has described the process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" [that] significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment . . . listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work [that] the claimant could perform.

Loturco v. Barnhart, No. 00 CIV.8052, 2005 WL 1041140, at *5 (S.D.N.Y. May 6, 2005) (quoting Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 1998)). The claimant bears the burden of proof for the first four steps of this process but at step five, the burden shifts to the Commissioner. Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

Furthermore, when employing this five-step process, the Commissioner must consider the following four factors: "(1)

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Id.

Applying this five-step framework to the plaintiff, the ALJ found (1) that Coyle was not engaged in substantial gainful activity; (2) that Coyle had a severe physical impairment that significantly limited his ability to do basic work activities; (3) that Coyle's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4; (4) that Coyle had the ability to perform his past work as a bank manager; and (5) that Coyle had a residual functional capacity to lift, carry, push, and pull up to 5 pounds frequently and 10 pounds occasionally. (Tr. 308). The ALJ also found that plaintiff could sit up to 6 hours and stand and walk for up to 2 hours. (Id.). Coyle argues that the ALJ erred in finding that he was able to perform sedentary work and more specifically, perform his past relevant work as a bank manager.

II. Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if he establishes

that no material facts are in dispute and that he is entitled to a judgment as a matter of law. Persaud v. Barnhart, No. 01 Civ. 8461, 2004 U.S. Dist. LEXIS 3706, at *4 (S.D.N.Y. Feb. 11, 2004) (citing Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999)). The court must accept as true all factual allegations in the complaint and corresponding answer. See Bartels v. Barnhart, No. 04 Civ. 1433, 2005 U.S. Dist. LEXIS 10118, at *3 (S.D.N.Y. May 23, 2005) (citing Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001)). The court must also draw all reasonable inferences in favor of the nonmoving party. Id.

The court may set aside the Commissioner's decision to deny disability benefits only when it is based on legal error or is not supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). The reviewing court must also give substantial deference to the Commissioner's decision. See Morgan v. Barnhart, No. 04 Civ. 6024, 2005 WL 925594, at *7 (S.D.N.Y. Apr. 21, 2005) (citing Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002)). Thus, since the reviewing court is not permitted to review the Commissioner's decision de novo, where substantial evidence supports the Commissioner's determination, the decision must be upheld. Persaud, 2004 U.S. Dist. LEXIS 3706, at *5.

Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This substantial evidence test applies not only to the Commissioner's factual findings but also to the inferences and conclusions of law to be drawn from such facts. See Caraballo ex rel. Cortes v. Apfel, 34 F. Supp.2d 208, 214 (S.D.N.Y. 1999). Therefore, to determine if substantial evidence exists, the reviewing court must examine the entire record including any contradictory evidence. See Brown v. Apfel, 174 F.3d at 69.

While the Commissioner need not reconcile every conflict in the record, Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); see also Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (stating that the claimant is entitled to an explanation of why the Commissioner discredited the treating professional's opinion). In the event that the court finds a lack of substantial evidence for the Commissioner's findings, the court has two options. If there are gaps in the administrative record or the ALJ has applied an improper legal standard, the court

will remand the case for further development of the evidence. <u>See</u> <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980). If, however, the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits. <u>Id.</u> <u>See</u> <u>Gold v. Sec'y of Health, Education & Welfare</u>, 463 F.2d 38, 44 (2d Cir. 1972).

III. <u>Analysis</u>

Plaintiff raises three issues challenging the ALJ's finding that he has the residual functional capacity to perform sedentary work. He argues that he did not receive a full and fair hearing because the vocational expert's assessment did not include all of his symptoms and the treating physician's opinion was not given considerable weight. (Plaintiff's Memorandum of Law in Support of His Motion for Judgment on the Pleadings ("Pl. Support Memo") at p. 22). Plaintiff further contends that because he has problems with bimanual dexterity, the ALJ's finding is contrary to Social Security law. (Pl. Support Memo at 22-23). Lastly, plaintiff argues that the ALJ's decision is not supported by substantial evidence. (Pl. Support Memo at 23). We conclude that the plaintiff did have a full and fair hearing, that the ALJ's decision is not contrary to Social Security law and that the ALJ's decision is supported by

substantial evidence.

## A. Full and Fair Hearing

To determine if the plaintiff received a full and fair
hearing, the court must examine the questions the ALJ asked
regarding the disposition and extent of the claimant's symptoms.
See Mann v. Chater, No. 95 Civ. 2997, 1997 WL 363592, at *4-5
(S.D.N.Y. June 30, 1997). The court must also examine the  length
of the transcript. Id. (citing Cruz v. Sullivan, 912 F.2d 8, 11-12
(2d Cir. 1990) (holding that an underdeveloped thirteen-page record
warranted a remand because the plaintiff did not have a thorough
hearing)); see also Almonte ex. rel Almonte v. Barnhart, No. 03
Civ. 1048, 2004 WL 1242512, at *2 (E.D.N.Y. May 26, 2004) (finding
a seven page transcript inadequate evidence of a full and fair
hearing). The court must also determine whether the ALJ met his
affirmative duty to develop the record. See, e.g., Crespo v.
Barnhart, 293 F. Supp. 2d 321, 325 (S.D.N.Y. 2003). This duty
requires the ALJ to consider all relevant evidence prior to making
his decision and, when appropriate, to give considerable weight to
the treating physician's opinion. Id. Moreover, even when the
plaintiff is represented by counsel, the ALJ still has the duty to
develop the record. See Perez v. Chater, 77 F.3d 41, 47 (2d Cir.
1996).

Here, the transcripts of both ALJ hearings are of considerable length. These transcripts also demonstrate that the ALJ asked the plaintiff detailed questions concerning his symptoms and medical maladies. One such example from the plaintiff's first hearing is the ALJ's line of questioning pertaining to his peripheral neuropathy. (Tr. 41-43). The record reflects that the ALJ asked the plaintiff about his condition at length to determine the onset of this particular ailment and how this ailment has affected the plaintiff's everyday activities. (Id.). Furthermore, since plaintiff was represented by counsel, the ALJ does not have the heightened obligation to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" as he would with a pro se plaintiff. Eschevarria v. Secretary of Health & Human Services, 685 F.2d 751, 755 (2d. Cir. 1982). Thus, we conclude that the ALJ has adequately developed the record.

The plaintiff also contends that because the ALJ did not include all of his impairments in the hypothetical he posed to the vocational expert, the vocational expert made an incomplete assessment of his capabilities. Plaintiff argues that the vocational expert did not consider his problems with fine motor dexterity, lightheadedness, dizziness, deterioration of sight or the effect of stress from the job. (Pl. Support Memo at 22). "Hypothetical questions posed to vocational experts ordinarily must

include all limitations that are supported by the medical evidence in the record." <u>Steele v. Barnhart</u>, 290 F.3d 936, 942 (7th Cir. 2002)). This rule ensures that the vocational expert's testimony accounts for the plaintiff's full range of limitations. <u>Id.</u> "An exception therefore exists for cases in which the vocational expert independently learned of the limitations (through other questioning at the hearing or outside review of the medical records . . . ) and presumably accounted for them." <u>Id.</u> (citing <u>Ragsdale v. Shalala</u>, 53 F.3d 816, 818-21 (7th Cir. 1995)).

Here, while the ALJ's hypothetical only addressed whether a similarly aged and educated person capable of performing sedentary work could perform the plaintiff's prior job as a bank manager, the record indicates that the vocational expert had reviewed the transcript. (Tr. 338). Thus, since the transcript contained testimony from both the plaintiff and the reviewing physician, the vocational expert was fully aware of plaintiff's limitations at the time of her testimony. Furthermore, since plaintiff's counsel asked the vocational expert about how the plaintiff's specific ailments would affect his ability to work, these questions cured the ALJ's omission. (Tr. 339-340).

The plaintiff also objects to the DOT number used by the vocational expert in her testimony. (Pl. Support Memo at 19). The

vocational expert testified that the DOT categorized a branch manager as a sedentary job. Id. However, the DOT number used by the vocational expert did not specifically refer to the financial industry. Id. This purported error by the vocational expert is harmless since the DOT section that refers to a financial branch manager also identifies this job as sedentary. See U.S. Department of Labor, Dictionary of Occupational Titles § 186.167-086 (4th ed. 1991). Moreover, in his decision, the ALJ referred to both DOT numbers. (Tr. 307). Thus, the vocational expert's error is not enough to show that the plaintiff did not receive a full and fair hearing.

B. Treating Physician's Rule

Finally, the plaintiff claims that he did not receive a full and fair hearing because the correct weight was not given to the treating physician's opinion. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); Schaal v. Apfel, 134 F.3d 496, 503 (2d. Cir. 1998). However, this general rule does not apply where the treating physician's opinion is inconsistent with the other substantial evidence in the record, such as the opinions of other

medical experts. Hogue v. Barnhart, 03 Civ. 4963, 2005 WL 1036336 at *12 (S.D.N.Y. May 3, 2005) (citing Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)). When the treating physician's opinion is not given controlling weight, the ALJ must consider the following factors to determine how much weight to give to the opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Id. (quoting 20 C.F.R. § 404.1527(d)(2)). The ALJ must also set forth his reasons for the weight assigned to the treating physician's opinion. Rivera v. Barnhart No. 04 Civ. 1484, 2005 WL 735936, at *7 (S.D.N.Y. March 30, 2005).

     Here, the ALJ asserted three reasons for refusing to give Dr. Spinapolice's opinion controlling weight. First, the ALJ stated that Dr. Spinapolice's collective opinions "contained numerous inconsistencies concerning the plaintiff's abilities." (Tr. 305). Second, he stated that Dr. Spinapolice's opinions were inconsistent with the "longitudinal treatment notes contained in the record." (Id.). Lastly, the ALJ stated that Dr. Spinapolice's opinions were inconsistent with the plaintiff's testimony about his daily activities. (Tr. 306). We find that the ALJ properly refused to

give Dr. Spinapolice's opinion controlling weight for all the reasons stated above.

Dr. Spinapolice's reports contain conflicting information about the plaintiff's limitations and ailments. In his report dated June 17, 1997, Dr. Spinapolice indicated that the plaintiff could only lift five pounds and sit for less than six hours a day. (Tr. 146-47). However, when asked to comment on the plaintiff's residual functional capacity prior to December 31, 1997, Dr. Spinapolice indicated that the plaintiff could lift ten pounds and had to alternate between sitting and standing to alleviate his pain and discomfort. (Tr. 386). On a third report dated January 13, 1998, Dr. Spinapolice indicated that the plaintiff could lift and carry ten pounds, could sit for up to 6 hours, and could walk for less than two hours. (Tr. 258). Dr. Spinapolice's next report stated that the plaintiff could only sit for two hours but could walk for three hours. (Tr. 271). Because these reports contain numerous inconsistencies, the ALJ was correct to treat Dr. Spinapolice's opinion that the plaintiff could not perform any gainful employment as less than persuasive and not controlling.

Similarly, the ALJ was correct not to treat Dr. Spinapolice's opinion as controlling because his reports were contrary to the opinions and notes of the other examining and consulting

physicians. For example, notes from the plaintiff's treating cardiologist, Dr. Landzberg, reflect that the plaintiff was "feeling well," "walking daily," and "playing golf twice a week." (Tr. 190). Dr. Landzberg's notes also indicate that the plaintiff's diabetes were under control and that he was not experiencing any chest or back pain. (Tr. 192). Likewise, Dr. King's examination of the plaintiff indicated that there were no limitations on the plaintiff's ability to sit or perform any manipulative activities. (Tr. 214).

Moreover, after reviewing all the medical evidence, the reviewing medical expert, Dr. Bernanke, testified at both hearings that the plaintiff was capable of performing sedentary work. (Tr. 66, 330). Thus, Dr. Bernanke's opinion is also in direct opposition to that of Dr. Spinapolice's assessment. Since the findings of the examining and consulting doctors contradict Dr. Spinapolice's opinion that the plaintiff's diabetes, residual functional capability limitations and back problems prevent him from working, the ALJ was correct to not treat Dr. Spinapolice's opinion as controlling.

Dr. Spinapolice's findings are also contradicted by the plaintiff's own testimony. Dr. Spinapolice's October 1998 report indicates that the plaintiff could only stand for two hours and

walk for three hours a day. (Tr. 271). However, the plaintiff's daily activities suggest that he has a greater ability to function. Specifically, at the time of his first hearing, plaintiff did chores around the house, walked daily for up to three miles a day, drove locally and played golf twenty times a year. (Tr. 44, 51-52). At these golf games, plaintiff carried his own clubs without assistance and walked the entire three and a half mile course. (Tr. 51-53). While the plaintiff does not need to be an invalid to be found disabled under the Social Security Act, see Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998), the plaintiff's level of physical activity demonstrates that he has the residual functional capacity necessary to perform sedentary work. Thus, treating Dr. Spinapolice's opinion as less than controlling did not deprive the plaintiff of a full and fair hearing.

C. Bimanual Dexterity

Plaintiff also asserts that because he has problems with bimanual dexterity, the ALJ's finding that he can perform sedentary work is contrary to Social Security law. The plaintiff relies on Social Security Ruling 96-9P as support for his claim. (Pl. Support Memo at 22-23). However, this Ruling only addresses the manipulative limitations of individuals working in unskilled

sedentary jobs.[6] Since the plaintiff's past relevant job as a bank manager is a skilled, sedentary position, the plaintiff's reliance on this Ruling is misguided. Moreover, the Dictionary of Occupational Titles specifically states that the necessary finger dexterity for a financial branch manager is only a level 4 or the lowest one-third. DOT § 186.167-086. Thus, since the plaintiff testified that he could perform some fine finger manipulations such as dialing a phone, writing with a pen and picking up money to pay for purchases, (Tr. 42), the ALJ's finding that he is capable of performing his past relevant work is not contrary to Social Security law.

D. <u>Substantial Evidence</u>

Finally, the plaintiff argues that there was no substantial evidence for the ALJ's finding. However, we find that the ALJ's decision that the plaintiff had the ability to perform sedentary work is supported by substantial evidence. At his supplemental hearing, the plaintiff testified that his degenerating back and bending limitations prevented him from working. (Tr. 40). However, the medical reports by the treating and consulting physicians

---

[6] "Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. . . . Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." SSR 96-9P, 1996 WL 374185, *8.

report that the plaintiff has the residual functional capability to perform sedentary work. (Tr. 214, 261, 330). Moreover, the vocational expert testified that the plaintiff could do the work required of a bank manager even if he had difficulty bending. (Tr. 340). Only Dr. Spinapolice opined that plaintiff was incapable of any gainful employment, however, as discussed above, his findings are not entitled to dispositive weight.

There is also substantial evidence to support the ALJ's denial of the plaintiff's claim that he is unable to work because of his heart disease and complications from diabetes mellitus. (Tr. 50, 301). The record reflects that since plaintiff's second MI on January 16, 1996, his heart condition has improved. Dr. Landzberg's notes as well as plaintiff's stress test results report that he had no chest pain. (Tr. 190-191, 221). Additionally, there are no medical records, nor has plaintiff claimed, any subsequent complications due to heart disease. The medical records of Dr. Landzberg also report that plaintiff's diabetes was under control. (Tr. 192). Moreover, Dr. Bernanke testified that any dizziness, lightheadedness or trembling caused by hypoglycemic episodes could be managed simply by eating something. (Tr. 69). Therefore, we find that the ALJ had substantial evidence to conclude that the plaintiff was not entitled to any disability benefits.

R. Civ. P. 72, 6(a), 6(e).

**DATED: New York, New York**
        **October 6, 2005**

                              RESPECTFULLY SUBMITTED,


                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE



Copies of the foregoing Report and Recommendation have been
mailed this date to:

Carol S. Goldstein, Esq.
424 North Main Street
P.O. Box 525
Monroe, New York 10950

Lorraine S. Novinski, Esq.
Assistant United States Attorney
for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007